## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JACK J. GRYNBERG, | : | |
| PRICASPIAN DEVELOPMENT CORPORATION, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. |
| | : | |
| TOTAL COMPAGNIE FRANCAISE DES PETROLES, | : | 10-_____ |
| TOTAL FINA ELF S.A., | : | |
| TOTAL S.A., | : | |
| ROYAL DUTCH PETROLEUM COMPANY, | : | |
| SHELL TRANSPORT AND TRADING CO., P.L.C., | : | |
| SHELL PETROLEUM N.V., | : | |
| SHELL EXPLORATION B.V., | : | |
| and SHELL INTERNATIONAL EXPLORATION AND | : | |
| PRODUCTION B.V. f/k/a  SHELL INTERNATIONALE | : | |
| PETROLEUM MAATSCHAPPIJ B.V., | : | |
| | : | |
| Defendants. | : | |

-----------------------

### COMPLAINT

-----------------------

Plaintiffs Jack J. Grynberg and Pricaspian Development Corporation for their complaint aver as follows:

### INTRODUCTION

1.      This is an action to recover plaintiffs' rightful share of the massive Greater Kashagan Oil Fields ("GKOF"), located under the Northeastern Caspian Sea, in Kazakhstan, which plaintiff Jack Grynberg discovered.

2.      The defendants in this action entered into joint venture agreements with Grynberg to develop the GKOF.  Under these joint venture agreements, Grynberg shared

original interpretive seismic maps he created of the GKOF and other confidential and proprietary information.  Defendants promised to maintain the confidentiality of these maps and other information and to use them only in connection with their joint venture agreements with Grynberg.

3.     In flagrant breach of these joint venture agreements, and defendants' fiduciary duties to plaintiffs under these agreements, defendants appropriated Grynberg's original discovery to themselves.

4.     Defendants entered into a secret and illegal conspiracy with other oil companies spearheaded by James H. Giffen, who had managed to infiltrate himself into a position as a top advisor to the government of Kazakhstan on oil, natural gas and elemental sulphur development.

5.     Giffen orchestrated a scheme under which defendants and other oil companies, without Grynberg, formed a consortium that obtained a 40-year production and sharing concession from Kazakhstan to develop and produce the GKOF in exchange for a $175 million bribe to top Kazakh officials.   Defendants each contributed $25 million to this bribe.

6.     Defendants breached their obligations to Grynberg by stealing the benefit of Grynberg's original discovery of the GKOF, misappropriating for themselves his original, confidential and proprietary interpretive seismic maps and other data, and entering into a consortium to develop and produce the GKOF that did not include Grynberg.

7.     Giffen has since been indicted in the United States for, and pleaded guilty along with his company Mercator Corporation to, violations of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2.  The indictment and guilty plea included the $175 million

criminal bribery scheme by which defendants obtained their concession to develop and produce the GKOF.

8.      Notwithstanding his guilty plea, Giffen claimed that he was acting at the behest of the United States government when he orchestrated these criminal bribes.  On November 19, 2010, Judge William H. Pauley of the United States District Court of the Southern District of New York ruled in connection with his sentencing that Giffen had indeed been acting as an agent of the United States government when he orchestrated these bribes and dramatically reduced the sentence for which Giffen was eligible and for which Giffen had plea bargained.

9.      Thus, defendants here acted in an integrated alliance with a federal agent when they misappropriated Grynberg's original discovery of the GKOF.

10.      Defendants therefore not only misappropriated Grynberg's original trade secrets, breached their joint venture agreements with Grynberg, and breached their fiduciary duties to Grynberg, they also violated Grynberg's due process rights under the Fifth Amendment to the United States Constitution.

**PARTIES**

11.      Plaintiff Grynberg is a resident and citizen of the state of Colorado, whose address is c/o Grynberg Petroleum Company, 3600 South Yosemite Street, Suite 900, Denver, Colorado 80237-1830, USA.

12.      Plaintiff Pricaspian Development Corporation ("PDC") is a Texas corporation headquartered and doing business at 3600 South Yosemite Street, Suite 900, Denver, Colorado 80237-1830, USA.  Pricaspian Development Corporation is the assignee of a substantial portion of Grynberg's rights in the GKOF and the claims asserted in this action.

13.     Grynberg and, more recently, PDC have been engaged in the international petroleum industry for over 40 years, during which time Grynberg has developed numerous relationships with people in the oil, natural gas and mineral exploration, development and production industries in the former Soviet Union.

14.     Defendants Total S.A., Total Final Elf S.A., and Total Compagnie Francaise de Petroles (collectively, "Total") are incorporated under the laws of France.  Total operates a vast vertically integrated enterprise to supply energy, chemicals and other products throughout the world, including Delaware.  Its address is 2 place de la Coupole, La Defense 6, 92400 Courbevoie (a suburb of Paris), France.  Total has engaged in a persistent course of conduct in Delaware using three Delaware subsidiaries, Total E&P Research & Technology USA, LLC, Total E&P USA, Inc., and Total E&P New Ventures, Inc.  These subsidiaries are among the largest chemical and oil exploration and processing companies in the world, are directly controlled by Total, and operate as agents of Total to accomplish its business in Delaware.  At all times pertinent hereto, there has existed between Total and its Delaware subsidiaries common ownership, financial dependence of the subsidiaries on Total, significant interference by Total in the selection and assignment of the executive personnel of these subsidiaries, and significant control by Total over the business and operational policies of these Delaware subsidiaries.

15.     Defendants Royal Dutch Petroleum Company, Shell Petroleum N.V., Shell Exploration B.V., and Shell International Exploration and Production B.V. f/k/a Shell Internationale Petroleum Maatschappij B.V. are incorporated under the laws of the Netherlands and headquartered at 30 Carel van Bylandtlaan 2596 HR, The Hague, The Netherlands.  These companies operate a vast vertically integrated enterprise jointly with Shell Transport and Trading Co., P.L.C., incorporated in the United Kingdom and headquartered at Shell Centre London SE1 7NA, England , to supply oil and natural gas, their

derivatives, energy, petrochemicals and other products throughout the world, including Delaware (collectively, "Shell"). As of December 31, 2002, Shell controlled approximately 1370 subsidiaries of which at least 26 are registered with the Delaware Secretary of State. These subsidiaries are among the largest chemical and oil exploration and processing companies in the world, are directly controlled by Shell, and operate as agents of Shell to accomplish its business in Delaware. At all times pertinent hereto, there has existed between Shell and its Delaware subsidiaries common ownership, financial dependence of the subsidiaries on Shell, significant interference by Shell in the selection and assignment of the executive personnel of these subsidiaries, and significant control by Shell over the business and operational policies of these Delaware subsidiaries.

## JURISDICTION

16. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1332.

17. This Court has personal jurisdiction over defendants under 10 Del. C. § 3104(c), because defendants regularly do, and solicit, business in Delaware, and have engaged in a persistent course of conduct in Delaware using multiple Delaware subsidiaries. These subsidiaries are among the largest chemical and oil exploration, production and processing companies in the world, are directly controlled by defendants, and operate as agents of defendants to accomplish their business in Delaware. At all times pertinent hereto, there has existed between defendants and their respective Delaware subsidiaries common ownership, financial dependence of the subsidiaries on defendants, significant interference by defendants in the selection and assignment of the executive personnel of these subsidiaries, and significant control by defendants over the business and operational policies of these Delaware subsidiaries.

**OPERATIVE FACTS**

18.     Grynberg and PDC bring this action against Total and Shell for unjust enrichment, misappropriation of trade secrets, breach of contract, breach of fiduciary duty and violation of Grynberg's due process rights under the Fifth Amendment of the United States Constitution.  As will be shown in detail below, Total and Shell appropriated to themselves a substantial portion of the significant value of Grynberg's share in the GKOF, which is the largest oil, natural gas, and elemental sulphur discovery in the world in over 40 years, located in the Northeastern Caspian Sea, offshore Kazakhstan in only 5 meters of water.

19.     Defendants Total and Shell each own 16.81 percent of GKOF.

20.     Under the terms of joint venture agreements between Grynberg and Total and Shell respectively, dating back to the original delineation of the discovery by Grynberg of this giant field in 1989 and in 1990, Total and Shell are liable to Grynberg for 20% of the carried net profit they will earn when production commences in 2012 to 2014.

21.     Nevertheless, Total and Shell have refused to pay fair compensation for misappropriating Grynberg's original discovery.

A.     *The GKOF*

22.     The GKOF is the largest oil, natural gas and elemental sulphur field in Kazakhstan.  Its production area is considered to be 320,000 acres (129.555 hectares).  By comparison, Alaska's giant Prudhoe Bay Oil Field is roughly 150,000 acres (60,703 hectares).

23.     The GKOF is expected to begin production sometime between 2012 and 2014.  The GKOF is widely believed to contain between 6.4 to as much as 60 billion barrels of oil in the Carboniferous reef originally mapped by Grynberg.  Conservative

estimates place the figure at approximately 10 billion barrels.  This is low in comparison with the figures for oil in place (*i.e.,* in the field itself although not necessarily recoverable) ranging from between 30 to 50 billion barrels — the reason for the low recovery factor being the difficult geological nature of the field, though with the newest technologies of horizontal drilling and/or tertiary recovery by injecting carbon dioxide ($CO_2$), this low recovery factor can be overcome.  In addition, there should exist recoverable reserves in the deeper Devonian reef.

24.      Once the GKOF and neighbouring fields reach their full production capacity, then they are expected to produce the equivalent of approximately 20% of Europe's energy needs.  This makes the GKOF an extremely important global source of non-OPEC energy.

25.      In addition to oil, condensate and natural gas, the GKOF has a very high concentration of hydrogen sulphide (H2S), the main source for future elemental sulphur production in the world.

26.      Elemental sulphur is a necessary ingredient to make sulphuric acid (H2SO4), which is the basis for the manufacture of fertilizer, namely ammonium sulfate, and dimethyl disulphide (DMDS), a necessary ingredient for agricultural pesticides to be used for the agricultures of a hungry world.  The Giant Lacq Natural Gas Field in Pau, in southern France, which is operated by Total, has been the major source of elemental sulphur for Europe.  It is now in the final phases of its production life and thus in the final stage of its supply of elemental sulphur.

27.      With the newest technologies, the recovery factor of natural gas in place in the GKOF would be in the order of 80% with an average H2S content of 19% based on best natural gas analysis information.

28.     At 2,500 cubic feet per barrel x 30,000,000,000 barrels x 80% recovery factor x 19% H2S content, as much as 11.4 trillion cubic feet of H2S gas, equal to 508,000,000 tons of elemental sulphur, could be recovered, potentially making the GKOF Europe's and the world's greatest source of elemental sulphur supply for the next 40 years.

29.     In 1990, Grynberg analyzed the rapidly depleting supply of elemental sulphur from existing sources:

   a)  Production of elemental sulphur from the cap rocks of salt domes in the U.S. and Mexican Gulf Coast were 70-plus years old and close to depletion.

   b)  Production of sulphur from Total's Lacq Natural Gas Field in the Pau region of southern France were only several years from depletion.

   c)  Canadian supplies of H2S were rapidly declining and close to depletion.

   d)  Similarly, elemental sulphur produced in the Wyoming Big Horn Basin from H2S in the Phosphoria and Tensleep formations was close to depletion.

   e)  Elemental sulphur production from the Prinos Oil Field in Greece, which Grynberg discovered, was small and close to depletion.

30.     Based on the above, Grynberg informed both Total and Shell that the price of elemental sulphur could reach a value of $200 per ton with the GKOF becoming a major source of elemental sulphur and thus a major revenue source for 40 years to come, which is the length of the GKOF production concession.  This prediction has since been proven to have been correct, because today, the Tengiz/Korolev Oil Fields, located onshore nearby to the East, are a major supplier and exporter of elemental sulphur, signaling huge

potential profits for the partners of the GKOF.  Tenzig/Korolev is, in geophysical terms, closely analogous to the GKOF.

**B.**     ***Grynberg's Discovery of the GKOF***

31.     In late 1989 and in 1990, Grynberg spent substantial time, money and energy developing original proprietary, geophysical, technical, economic, highly confidential and exclusive information regarding existing petroleum fields, prospects and potential prospective areas for oil, condensate, natural gas and elemental sulphur exploration, development and production in Kazakhstan, the second largest (by area) republic in the former Soviet Union after Russia.

32.     In September 1989, Grynberg attended the American Mining Congress Convention in San Francisco.  Grynberg met there the Chairman of the Attestation Committee of the U.S.S.R., along with his aide.  The Chairman was also the Natural Resource adviser to the Soviet Politbureau, as well as to the Soviet Government and to the then Prime Minister of the U.S.S.R., Nikolai Ryzkov.

33.     In early November 1989, Grynberg was invited by the Chairman to Moscow to review secret Soviet seismic data from and over the Caspian Sea, and from onshore sites in Northwestern Kazakhstan.  Grynberg traveled in mid-November to Moscow, and spent approximately one week in the conference room of the Attestation Committee building studying boxes of Soviet seismic data covering the Caspian Sea and adjacent areas. Using 6 key seismic lines, Grynberg mapped a giant reef in 5 meters of seawater in the Northeastern Caspian Sea, close to shore.  A copy of this map is attached hereto, as well as a map showing Grynberg's original interpretation superimposed on today's GKOF.  *See* Ex. A.

34.     Later in November of 1989, Grynberg, upon returning from Moscow, was contacted by the US State Department with a request to host a Kazakhstan delegation consisting of 7 members, who were interested in inspecting Grynberg's cattle feeding operations north of Denver.  Grynberg had a top secret clearance from the U.S. Army Research and Development Command, where he served in 1956 and 1957.  Fluent in Russian, Grynberg agreed to host this delegation, and arranged for a detailed presentation of his cattle feeding operations north of Denver.  During the dinner that Grynberg hosted at his home for the delegation, the then-First Secretary of Kazakhstan, Nursultan Abishevich Nazarbaev, who led the delegation, invited Grynberg and his team to visit Kazakhstan for potential investment in oil, natural gas and mining.

35.     In early February 1990, Grynberg brought two teams to Kazakhstan; one to study mining opportunities and the other to study Kazakhstan's oil and natural gas fields.  The oil and natural gas team was headed directly by Grynberg, Frank Rubio, a classmate of Grynberg's at the Colorado School of Mines, assisted by Gonzalo Gamero of Maraven S.A., a Venezuelan government owned oil company.

36.     The oil and natural gas team was given Aeroflot tickets to Guriev, now Aktau, where a presidential helicopter was awaiting them to tour the oil fields in the Caspian Sea areas.  The team was then flown at Kazakhstan's expense approximately 3000 kilometers east, to Alma-Ati where it was hosted for presentations and dinners by President Nazarbaev. They were then given tickets back to Moscow where the group stayed at a Kazakhstan hotel attached to the Kazakhstan Embassy and around the corner from the Attestation Committee Building.  This technical trip to the Caspian Sea Area and Alma-Ati was invaluable, and confirmed what Grynberg had seen in mid-November of 1989 in Moscow with respect to the oil and natural gas potential in the Caspian Sea.

37.     In April 1990, Grynberg arranged for President Perez of Venezuela to invite Nazarbaev, now President of Kazakhstan, for a state visit to Caracas, Venezuela. Grynberg and Senior executives of Maraven met President Nazarbaev at the Caracas airport where he arrived via Cuba and Mexico from Moscow.  Grynberg spent that week with Nazarbaev in Venezuela, where President Nazarbaev witnessed western oil field development and production projects and was entertained by the Venezuelan Government and by Maraven. President Nazarbaev affirmed his commitment to assist Grynberg in forming an international oil and natural gas consortium to explore, develop and produce oil and natural gas in Kazakhstan.

38.     In June 1990, at the conclusion of a return visit to Alma-Ati, Grynberg signed the first of several protocols with Kazakh officials.  This protocol called for Grynberg to form a consortium of oil companies to explore and develop oil and gas fields in Kazakhstan, including the GKOF.  *See* Ex. B (in Russian, with English translation).

39.     Later in June 1990, Grynberg led a delegation of Kazakh officials on a tour of the Endicott and Prudhoe Bay oil fields in Alaska.  This trip convinced Kazakh officials that oil wells in the Northeastern Caspian Sea could be built on man-made islands (as in the Endicott oil field) in order to protect the Caspian Sea, which is the source of 80% of the most valuable cavier, from environmental damage in the event of oil spills.  This was instrumental in Grynberg's receiving permission from Kazakh officials to pursue development of the GKOF.

C.     *Total's Misappropriation of Grynberg's Original Discovery*

40.     At the behest of the Kazakh government, Grynberg met in 1990 and 1991, with 10 different Western oil companies and their designated subsidiary corporations as candidates to participate in a consortium to develop and produce the GKOF:

a)      British Petroleum Ltd. (BP);

b)      Statoil (Norwegian State Oil Company);

c)      British Gas P.L.C. (BG);

d)      Total S.A.;

e)      Royal Dutch Petroleum Corp. (Shell);

f)      Gulf Canada Ltd.;

g)      Unical, Inc.;

h)      Maraven, S.A. (International Oil Company of Venezuela);

i)      ARCO;

j)      Marathon Oil Co.; and

41.      All of these 10 companies received essentially the same original, unique, confidential and valuable seismic, geologic and economic information from Grynberg, consisting of:  (1) proprietary, original, confidential, technical, seismic and economic data gathered from Moscow in late-1989, and from Kazakhstan and other sources in 1990, along with Grynberg's expert proprietary geophysical interpretation and analysis of this data; (2) introductions to top level Kazakhstan government officials including its President, Prime Minister, Speaker of Parliament and their Senior Staff; and (3) the protocol received from Kazakh officials governing planned development of the GKOF by Grynberg and his joint venture partners.

42.      On July 20, 1990, Total accepted Grynberg's proposal to establish a joint venture under which Total agreed to carry Grynberg and/or entities owned by him for a net 20% profits interest.  *See* Ex. C.

43.      The joint venture agreement between Grynberg and Total:

a)      defined an Area of Mutual Interest ("AMI") comprising the

onshore and offshore Pricaspian Sedimentary Basin, which
included the GKOF; and

b)      contemplated that Grynberg would assist Total's entry,
along with Grynberg, into a consortium of companies that
would secure a concession from the government of
Kazakhstan to explore, develop and produce hydrocarbons in the
AMI.

44.     After signing this July 1990 agreement, Total misrepresented to
Grynberg that it had lost interest in the GKOF and had abandoned plans to participate in its
development.

45.     In reality, after being educated by Grynberg and supplied with original,
unique and highly confidential geophysical, technical and economic information, Total re-
focused its interest and made a priority of attempting to acquire a 50% interest in the GKOF
directly through Grynberg's primary political contact, President Nazarbaev.  Total was
prepared to pay a Swiss agent to facilitate this deal for 50% of the GKOF for 10% of its
profits, the net effect of which would have been greater compensation than the 20% carried
interest of Grynberg in a smaller participation.  This proves that, contrary to its assertions,
Total was still extremely interested in the GKOF, but wanted a greater share for itself.

46.     Ultimately, in November 1997, Total entered a consortium in
Kazakhstan in the precise area of the GKOF.  This consortium, called the Offshore Kazakhstan
International Operating Company ("OKIOC") did not include Grynberg.  Total used the
original, highly valuable and confidential seismic, technical and economic information provided
by Grynberg pursuant to their joint venture agreement, and the political contacts Grynberg had
nurtured and developed, as a roadmap in creating this consortium.

D.   *Shell's Misappropriation of Grynberg's Original Discovery*

47.   On or about July 17, 1990, Grynberg advised Shell that Grynberg had been assured in its discussions with top Kazakhstan officials (including its President Nazarbaev, Prime Minister Uzakbay Koremanovich Karamanov, and Eric Mugzamovich Asanbaev, leader of the Kazakhstan Congress and later Vice President of Kazakhstan) that the Republic of Kazakhstan was interested in and desirous of participating as a grantor of oil and natural gas exploration, development and production rights to, and as a partner with, a group of western oil companies to be organized by Grynberg.

48.   Shell's representatives, two of whom were Yorck H. de Heer and P.E.R. Lovelock, came to Grynberg's offices in Denver, Colorado, and agreed to enter into a joint venture with Grynberg on the same terms as Total.  (At that time, de Heer was employed by the defendant Shell Exploration B.V., and Lovelock by the defendant Shell International Exploration and Production.)  The Shell representatives were presented with the same unique, valuable and confidential maps and other geologic, seismic, and economic data that Grynberg shared with Total on the express understanding that Shell was agreeing to a joint venture with Grynberg to develop and produce the GKOF on the same terms as Total.

49.   Thereafter, Shell entered into the OKIOC consortium in November 1997 along with Total and other companies, thereby misappropriating to itself Grynberg's original discovery and stealing Grynberg's confidential and proprietary information without compensation.

E.   *Total's and Shell's Integrated Alliance With James H. Giffen*

50.   On numerous trips to the former Soviet Union, Grynberg would be contacted by an agent of the Central Intelligence Agency upon his return to Denver.  On each

of these occasions, the agent would question Grynberg about his contacts and experiences, including any requests by foreign government officials for bribes.

51.     During the June 1990 trip to Alaska with the Kazakh delegation, Grynberg was confronted by one of the members of the delegation, Dr. Eryk Asanbaev, the head of the Parliament of Kazakhstan.  Dr. Asanbaev suggested that Grynberg and his joint venture partners each make a $5 million payment into a joint bank account in order to obtain a concession to develop the GKOF, similar to a payment made by Elf Aquitaine, a French company and predecessor of Total, for an onshore area in the Central Eastern Pricaspian Basin.

52.     Grynberg firmly rejected this overture and responded that there was a minimum $1 million fine and 5 years in prison for violating the American Foreign Corrupt Practices Act.

53.     Upon his return to Denver, during his usual debriefing with an agent of the CIA, Grynberg informed the agent of this episode.

54.     A few months later, during a November 1990 trip to Alma-Ati, Kazakhstan, Grynberg was informed by President Nazarbayev that one James H. Giffen, an oil field supply salesman, had come to offer his services as an oil and gas advisor to Kazakhstan.

55.     Grynberg examined oil industry statistical data that Giffen had provided to establish credibility as a would-be advisor.  Grynberg recognized that the information provided by Giffen was valueless and so informed President Nazarbaev.

56.     On information and belief, although Giffen lacked expertise, Giffen knew that the way to obtain oil development concessions from the Kazakh government was by paying bribes to top Kazakh officials.

57.     On information and belief, Giffen further knew, either because he was informed by Kazakh officials or by his own contacts in the CIA, that Grynberg had rejected Dr. Asanbaev's overtures for a bribe.

58.     On information and belief, Giffen thereafter contacted Grynberg's joint venture partners and told them that he could obtain a concession for them from the Kazakh government to develop and produce giant the GKOF reef.

59.     As outlined in the subsequent grand jury indictment of Giffen, Giffen negotiated a "Production Sharing Agreement" between the members of the OKIOC, including Total and Shell, and the Kazakh government.

60.     Under this purported Production Sharing Agreement, the members of the OKIOC, including Total and Shell, paid a $175 million "signature bonus" to three Swiss bank accounts owned by Kazakh officials.  Far from a "bonus," this payment was simply a bribe by which the members of the OKIOC obtained their concession to develop the GKOF, thus stealing Grynberg's original discovery.  Since there were 7 members of the OKIOC, each of whom obtained a 1/7 interest, each contributed $25 million ($175 million/7) to the bribe.

61.     On information and belief, Giffen obtained Grynberg's original proprietary interpretive map of the GKOF and other confidential information, which Grynberg had shared with President Nazarbaev in order to obtain the June 1990 protocol to develop and produced the GKOF.  Giffen then used Grynberg's confidential and proprietary

information to entice the other oil companies to follow his illegal criminal bribery efforts and to join the OKIOC.

62.     The first oil well drilled in the GKOF, Kashagan East KE#1, is located on a man-made island, just as the oil wells in the 150,000 barrel-per-day Endicott Oil Field in the Arctic Sea offshore Alaska are situated.  *See* Ex. A.  Grynberg had convinced President Nazarbaev of this idea when President Nazarbaev expressed fear that 80% of the best caviar supplies from the Northeastern Caspian Sea could be damaged if an oil spill occurred.  The man-made island solution that Grynberg suggested got President Nazarbaev on board and allowed the protocols for development of the GKOF to be signed at the conclusion of the June 1990 Alaska trip.

## COUNT I — UNJUST ENRICHMENT

63.     Grynberg incorporates by reference the foregoing paragraphs 1 through 62 as if fully set forth herein.

64.     As set forth above, plaintiffs conferred significant benefits on defendants by sharing with them the original and extremely valuable confidential and proprietary information that Grynberg developed regarding the GKOF.

65.     Defendants, with the assistance of James H. Giffen, then bribed Kazakh officials to obtain the GKOF for themselves.

66.     There was no justification for defendants' acquisition of the GKOF for themselves.

67.     Defendants have refused to pay plaintiffs adequate compensation for their pro rata share acquisition of the GKOF.

68.     It is thoroughly inequitable for defendants to continue to retain the benefits of the GKOF without compensating plaintiffs.  Those benefits derive from original confidential and proprietary information developed by Grynberg, and from Grynberg's ties with Russian and Kazakh officials, which Grynberg established through a significant investment in time, money and energy.

69.     Plaintiffs have at all times acted in good faith, with honesty and fairness toward defendants.

WHEREFORE, plaintiffs Jack J. Grynberg and Pricaspian Development Corporation hereby respectfully demand that this Court enter judgment in their favor and against defendants and award plaintiffs relief as follows:

(i)     an accounting by defendants of the full value of the benefits they have obtained through their acquisition of plaintiffs' interest in Grynberg's original discovery of the GKOF;

(ii)    the imposition of a constructive trust in favor of plaintiffs on the entire amount of the benefits defendants have derived from their acquisition of plaintiffs' interest in the GKOF;

(iii)   the payment by defendants to plaintiffs of the cash value of a 20% carried interest in defendants' pro rata share in the GKOF;

(iv)    the payment by defendants of plaintiffs' attorneys' fees and other costs of suit; and

(v)     such other and further relief as the Court deems just and equitable.

## COUNT II — MISAPPROPRIATION OF TRADE SECRETS

70.     Grynberg incorporates by reference the foregoing paragraphs 1 through 69 as if fully set forth herein.

71.    Plaintiff Grynberg's discovery of the GKOF was a trade secret owned by him, as were Grynberg's original interpretative maps of the GKOF and surrounding region, which were created based on his expertise in analyzing and interpreting seismic data.

72.    Grynberg maintained the confidentiality of his original discovery of the GKOF and his original interpretive maps and only shared this information with defendants after they entered into joint venture agreements with Grynberg in which they promised to keep this information confidential.

73.    Defendants misappropriated Grynberg's discovery of the GKOF and his original interpretative maps through improper means, by forming the OKIOC consortium to develop the GKOF, bribing Kazakh officials to obtain a concession for that purpose, and completely excluding Grynberg from the consortium and its vast benefits.

74.    Defendants also wrongly shared Grynberg's original confidential and propriety information regarding the GKOF with the other members of the OKIOC consortium.

WHEREFORE, plaintiffs Jack J. Grynberg and Pricaspian Development Corporation hereby respectfully demand that this Court enter judgment in their favor and against defendants and award plaintiffs relief as follows:

(i)     the payment by defendants to plaintiffs of the cash value of a 20% carried interest in defendants' pro rata share in the GKOF;

(ii)    punitive damages;

(iii)   the payment by defendants of plaintiffs' attorneys' fees and other costs of suit; and

(iv)    such other and further relief as the Court deems just and equitable.

## COUNT III — BREACH OF CONTRACT

75.     Grynberg incorporates by reference the foregoing paragraphs 1 through 74 as if fully set forth herein.

76.     Total and Shell each entered into a joint venture agreement with Grynberg to develop the GKOF.

77.     Pursuant to that joint venture agreement, plaintiff Grynberg shared with both Total and Shell his original, valuable, confidential, geophysical, technical and scientific data regarding the GKOF, as well as personal contacts and politico-economic analysis and interpretation.

78.     Total and Shell breached promises of confidentiality along with the duties of good faith and fair dealing in their joint venture agreements with Grynberg by appropriating the GKOF for themselves and cutting plaintiffs out of any participation in the development of the GKOF.

WHEREFORE, plaintiffs Jack J. Grynberg and Pricaspian Development Corporation hereby respectfully demand that this Court enter judgment in their favor and against defendants and award plaintiffs relief as follows:

(i)     the payment by defendants to plaintiffs the cash value of a 20% carried interest in defendants' pro rata share in the GKOF;

(ii)    the payment by defendants of plaintiffs' attorneys' fees and other costs of suit; and

(iii)   such other and further relief as the Court deems just and equitable.

## COUNT IV — BREACH OF FIDUCIARY DUTY

79.     Plaintiffs incorporate by reference the foregoing paragraphs 1 through 78 as if fully set forth herein.

80.     Each of the defendants entered into a joint venture agreement with plaintiffs under which they owed plaintiffs fiduciary duties of loyalty.

81.     Defendants violated those duties by expropriating the original, confidential, extremely valuable, proprietary and unique information from Grynberg.

82.     Defendants lied to plaintiffs, asserting that defendants were abandoning their joint venture with plaintiffs out of purported lack of interest or because they supposedly lacked the wherewithal for future participation.

83.     Quite the contrary, defendants secretly formed the OKIOC consortium to develop the GKOF, bribed Kazakh officials to obtain a concession for that purpose, and completely excluded Grynberg from the consortium.

WHEREFORE, plaintiffs Jack J. Grynberg and Pricaspian Development Corporation hereby respectfully demand that this Court enter judgment in their favor and against defendants and award plaintiffs relief as follows:

(i)     the payment by defendants to plaintiffs the cash value of a 20% carried interest in defendants' pro rata share in the GKOF;

(ii)    punitive damages;

(iii)   the payment by defendants of plaintiffs' attorneys' fees and other costs of suit; and

(iv)    such other and further relief as the Court deems just and equitable.

## COUNT V — DUE PROCESS

84.     Plaintiffs incorporate by reference the foregoing paragraphs 1 through 83 as if fully set forth herein.

85.     At all times pertinent to this complaint, James H. Giffen acted at the behest of the United States government and was an agent of the United States government.

86.     In 1997, defendants, acting in concert with James H. Giffen, created the OKIOC, a consortium of oil companies.

87.     With the assistance of James H. Giffen, defendants bribed top government officials of Kazakhstan in order to obtain the rights to develop and produce the GKOF, which Grynberg originally discovered.

88.     In exchange for these criminal bribes, which violated the Foreign Corrupt Practices Act, the Kazakhstan officials gave defendants the sole rights to develop and produce for 40 years the GKOF.

89.     In other words, defendants, acting in concert with James H. Giffen, used these illegal criminal bribes to steal Grynberg's original discovery and misappropriate the original trade secrets and confidential propriety information that Grynberg had developed.

90.     In all of these actions, defendants participated in an integrated alliance with a federal agent, James H. Giffen, making them federal actors as well.

91.     Defendants' actions deprived Grynberg of his property in violation of his procedural and substantive due process rights under the Fifth Amendment.

WHEREFORE, plaintiffs Jack J. Grynberg and Pricaspian Development Corporation hereby respectfully demand that this Court enter judgment in their favor and against defendants and award plaintiffs relief as follows:

(i)    the payment by defendants to plaintiffs the cash value of a 20% carried interest in defendants' pro rata share in the GKOF;

(ii)    punitive damages;

(iii)    the payment by defendants of plaintiffs' attorneys' fees and other costs of suit; and

(iv)    such other and further relief as the Court deems just and equitable.

## JURY DEMAND

92.    Plaintiffs demand a trial by jury on all issues and claims so triable.

SCHNADER HARRISON SEGAL & LEWIS LLP

/s/ Richard A. Barkasy

Date:  December 10, 2010    Richard A. Barkasy (#4683)
SCHNADER HARRISON SEGAL & LEWIS LLP
824 N. Market Street, Suite 800
Wilmington, Delaware 19801-4939 (New Castle Co.)
Tel. (302) 888-4554
Fax: (302) 888-1696
Direct: (215) 972-7409
Email: rbarkasy@schnader.com